**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **JEANETTE GARRETT,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION 08-0175-WS-M** |
| ) | |
| **CEONIA STANTON, JR.,** *et al.*, ) | |
| ) | |
| **Defendants.** ) | |

**ORDER**

This matter comes before the Court on the Motions for Summary Judgment (doc. 49, 51, 53) filed separately by defendants, Jeff Dunn, Pat Donnelly, and Ceonia Stanton. Plaintiff states that she "does not oppose the dismissal of Donnelly and Dunn." (Doc. 60.) Accordingly, the Motions for Summary Judgment filed by defendants Dunn and Donnelly are **granted**, and all claims against those two defendants are **dismissed with prejudice**. With respect to defendant Stanton, his Rule 56 Motion has been briefed and is now ripe for disposition.[1]

**I.    Background.**

    *A.    Nature of the Case.*

This lawsuit arises from a case of mistaken identity. Officers of the Baldwin County Sheriff's Office's Drug Task Force incorrectly pegged plaintiff, Jeanette Garrett, as a person with whom they had dealt in undercover drug transactions in October 2003. On the strength of this errant identification, Garrett, a wheelchair-bound stroke victim who has difficulty speaking, was indicted by a Baldwin County grand jury, after which she surrendered to authorities and was

---

[1]    Defendants' summary judgment filings do not comport with the provision of Local Rule 7.2(a) that all motions for summary judgment must be accompanied by "suggested Determinations of Undisputed Fact and Conclusions of Law ... together with a proposed order of judgment." LR 7.2(a). These materials were not included with defendants' filings. In its discretion, and because the omission was not detected earlier, the Court will consider Stanton's Rule 56 Motion as filed, notwithstanding this defect. That said, counsel are reminded to adhere to the summary judgment procedures as set forth in Local Rule 7.2(a) henceforth.

placed on conditions of pretrial release.  When the officers realized their mistake, all charges against Garrett were dismissed.  The Baldwin County Sheriff's Office issued a written apology for the error, and endeavored to mitigate any adverse repercussions on Garrett's Social Security benefits.

Garrett sued Officer Ceonia Stanton, Jr., in this District Court on the following theories: (1) a § 1983 malicious prosecution claim against him in his individual capacity; and (2) state-law claims of malicious prosecution, outrage, wantonness and civil conspiracy against him in his individual capacity.[2]  The Complaint's *ad damnum* clause requests no declaratory or injunctive relief, but instead frames the relief sought by Garrett as consisting of compensatory and punitive damages, plus attorney's fees and costs.

**B.     Relevant Facts.**[3]

1.     *Defendant and the Baldwin County Sheriff's Office Drug Task Force.*

Stanton was employed by the City of Daphne Police Department from 1995 through 2006 in various capacities, including patrol officer and investigator.  (Stanton Dep., at 11-12.)[4] However, Stanton was also sworn in as a Baldwin County deputy sheriff in March 1998, even though he was a Daphne police officer, too.  (*Id.* at 17.)  Thus, at all times relevant to this action,

---

[2]     As originally framed, the Complaint included certain other causes of action, including a § 1983 false arrest claim, a state-law false imprisonment claim, and possibly claims against defendants in their official capacities, as well.  These claims were dismissed via Order (doc. 24) entered on October 22, 2008.

[3]     The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007).   Thus, Garrett's version of the facts is taken as true and all justifiable inferences are drawn in her favor.

[4]     In an apparent effort to discredit Stanton, plaintiff submits evidence of his disciplinary and employment history at the Daphne Police Department, including incidents of probation and suspension in 2001 and negative statements in performance evaluations from 2002 and 2004.  (Doc. 60, Exhs. 26-29.)  But plaintiff fails to link these incidents to Garrett's claims, to explain their relevance, or to provide any factual or legal basis for concluding that Stanton's disciplinary and performance record at the Daphne Police Department has any bearing on the issues presented on summary judgment.  Merely because Stanton was evaluated and disciplined by the Daphne Police Department does not imply that he was not a *bona fide* Baldwin County Deputy Sheriff during the relevant time period.

-2-

Stanton was working as a "dual officer," because he "was sworn in as a deputy sheriff as well as a Daphne police officer." (*Id.* at 14.)

With respect to his deputy sheriff role, Stanton "was with the Baldwin County Sheriff's Department with the drug task force," pursuant to which his duties were "to investigate drug activity within Daphne and also throughout the whole county of Baldwin County." (*Id.* at 15.) This was an ongoing task force operation, the purpose of which was to combat drug activity throughout Baldwin County. (*Id.* at 26, 31.) Task force members were also drawn from other municipalities in Baldwin County, but Stanton was the only Daphne Police Department officer assigned to this task force. (*Id.* at 22-23.) Stanton's duties for the Baldwin County Sheriff's Department were confined to his activities on the task force, and he did not perform any other functions for that agency. (*Id.* at 28, 32.) Stanton understood that his task force assignment was not permanent, but that he would retain the capacity to work with the sheriff's department as long as he stayed in law enforcement because he "was actually sworn in as a deputy sheriff." (*Id.* at 27.) Stanton had served continuously on the task force as a deputy sheriff for more than five years before the events giving rise to the Complaint took place.

In accordance with his dual role, Stanton carried both a Daphne Police Department badge and a Baldwin County Sheriff's Department badge. (*Id.* at 20.)[5] While working for the task force, Stanton continued to report to the Daphne Police Department, but he also had a supervisor at the Baldwin County Sheriff's Department. (*Id.* at 15, 53.) In performing his task force duties, Stanton typically worked out of a sheriff's office in Robertsdale, Alabama, rather than Daphne Police Department offices. (*Id.* at 35.) However, notwithstanding his "dual role," Stanton's paycheck came from the Daphne Police Department, not the Baldwin County Sheriff's Office. (*Id.* at 15, 17.) Stanton performed his task force duties pursuant to a set of written Policy Guidelines from the Sheriff's Office, and was admonished that "[f]ailure to comply with the guidelines ... shall result in the termination of [his] commission as a Deputy Sheriff and

---

[5]     The Task Force Interagency Agreement between the Baldwin County Sheriff's Office and Daphne Police Department provided that "[e]ach officer will be sworn as a deputy sheriff, thereby extending his/her authority to all areas of Baldwin County and in order to be covered for liability purposes under the Sheriff's blanket while serving with the task force as a deputy sheriff." (Doc. 55, Exh. I, at 1.)

member of the task force."  (Doc. 55, Exh. J, at 2.)

        2.     *The Undercover Drug Purchases of October 2003.*

      In mid-October 2003, pursuant to his task force duties, Stanton received reports of illicit narcotics trafficking activity in the Jackson Circle area, just outside the city limits of Daphne and within three miles of a school.  (Stanton Dep., at 56-59.)  On that basis, Stanton, along with two other task force members (former defendants Jeff Dunn and Pat Donnelly), launched an investigation of that area.  (*Id.* at 61.)  On October 14, 2003, Dunn and Donnelly went to Jackson Circle together and completed a videotaped undercover drug buy, with Stanton waiting nearby, in a location where he could hear but could not see what was transpiring.  (*Id.* at 61-63.)  A report completed by Stanton the next day summarized those events as follows:

> "On 10-14-03 at approximately 1630 hours. undercover officer purchased crack cocaine from a black female subject on Jackson Circle in Daphne, AL which is located within Baldwin County, Alabama.  The female subject [*sic*] true identity is unknown at the present time, but further investigation will be done to identify the subject."

(Doc. 55, Exhs. C & D.)[6]  The report listed the subject's height as 5'3", and her weight as 150 lbs.  (*Id.* at Exh. C.)  Stanton supplied this information by "guesstimation" from watching video of the transaction.  (Stanton Dep., at 67.)  Upon viewing the video, Stanton did not perceive the subject who sold crack cocaine to Dunn and Donnelly to be seated in a wheelchair or unable to speak clearly; rather, his observation was that the subject ambulated without assistance and spoke with no obvious impairment.  (*Id.* at 67-68.)

      Three days later, on October 17, 2003, the task force officers returned to Jackson Circle to attempt another undercover drug transaction and identify the seller.  (Stanton Dep., at 72, 74.)  This transaction was planned in much the same manner as its predecessor, with Dunn and Donnelly making the buy while Stanton waited nearby.  (*Id.* at 77.)  This time, however, the black female subject (the same person with whom Dunn and Donnelly had dealt previously) absconded with the money, never resurfacing with the drugs.  Stanton's report summarized the

---

[6]    The October 15 Report identifies the suspect as Jeanette Garrett, and fills in date of birth and age fields for her.  (Doc. 55, Exh. C.)  However, Stanton's testimony was clear that Garrett's name and date of birth were not included in the first iteration of the Report, but were "added in later."  (Stanton Dep., at 66-67.)

incident as follows:

> "On 10-17-03 at approximately 1712 hrs. undercover officers went to Jackson
> Circle. ... The officers had purchased narcotics three days prior from the same
> subject.  The undercover officers talked to the subject and ordered some drugs
> from the subject and gave her the money.  The subject advised them to give her
> seven minutes and come back and she would have what they wanted.  Officers
> came back several minutes later and the subject never showed up with the drugs."

(Doc. 55, Exh. C.)  None of the officers involved knew the identity of the black female subject
who had participated in these events.  (Donnelly Dep., at 28.)

> 3.       The Decision to Prosecute Garrett.

Stanton sought to identify the black female who had sold crack cocaine to Dunn and
Donnelly on October 14, 2003 and who had stolen their drug money three days later.  "At some
point in time," Stanton obtained a "partial name" for the subject: Jeanette.  (Stanton Dep., at 78.)
It is unknown whether the female subject identified herself to Dunn and Donnelly as Jeanette, or
whether another person in that area told the officers that the subject was named Jeanette.  (*Id.* at
79-80.)[7]  Either way, armed with this partial name, Stanton "did a search for all the Jeanettes in
the Baldwin County area through LETS, which is a database of people who have a valid driver's
license or a valid ID."  (*Id.* at 80-81.)  Plaintiff, Jeanette Garrett, was included in that database,
along with her photograph and other personal information.  (Doc. 60, Exh. 5.)  When Stanton
encountered plaintiff's photograph in the database, he "compared it to the video" of the drug
buy, a necessary step because Stanton never saw the person who sold crack cocaine to Dunn and
Donnelly.  (Stanton Dep., at 81.)  He compared Garrett's listed height in the database (5'3") to
the approximate height of the drug dealer by measuring where the drug dealer had been standing
next to the side mirror of the vehicle used by Dunn and Donnelly in the drug buy, and concluded
that they were similar.  (*Id.*)  Based on his comparison of Garrett's photograph to the video
images, his determination that the drug dealer was about as tall as the listed height for Garrett,

---

[7]       According to Stanton, "We had a name of Jeanette.  We formulated the name
Jeanette."  (Stanton Dep., at 113.)  He testified that he does not remember how that name was
formulated, or what the source of that information was.  The information was of questionable
reliability, in any event.  It is common knowledge that drug dealers often give false names, or
use street names, to conceal their true identities.  (Dunn Dep., at 63.)  To this day, it apparently
remains unknown whether the offender's actual name was Jeanette.

and the fact that Garrett's first name matched that which had been obtained for the offender, Stanton "felt that she was the possible suspect at that point in time." (*Id.* at 85.)

Notwithstanding his belief that Garrett was the drug dealer, Stanton was confronted with several facts casting doubt on this identification. First, the LETS database listed Garrett's weight at 196 lbs., substantially higher than the 150 lbs. he had estimated from the video. (Doc. 60, Exh. 5; Stanton Dep., at 82, 85-86.) Stanton shrugged off this discrepancy on the theory that "who is to say that individual couldn't have lost weight." (Stanton Dep., at 86.) Second, when Stanton showed Garrett's photograph to Dunn (who had actually seen the drug dealer face to face on two occasions) and indicated that "I think this is the girl from Jackson Circle," Dunn's reaction was, "I said, man, I don't know. ... I just wasn't sure if that was her or not." (Dunn Dep., at 61.) Third, when Stanton showed Donnelly (who had also seen the drug dealer) the LETS printout of Garrett, Donnelly's reaction was that "I was unsure, and I remember questioning the weight difference." (Donnelly Dep., at 30.) Donnelly's testimony is that he knew of no facts that would support the existence of probable cause to arrest Garrett as the person who had sold drugs to the officers in October 2003. (*Id.* at 39.)

Despite these inconvenient facts calling into question the viability of this suspect, Stanton never sought out Garrett or attempted to contact her. In fact, he never saw or spoke to her at all. (Stanton Dep., at 117.)[8] Nonetheless, Stanton "thought that was the individual who sold crack cocaine on that particular day." (*Id.* at 119.) Eventually, Stanton presented the case against Garrett to a grand jury in order to "obtain a warrant for an individual" and "to see if there is due cause to continue the investigation." (*Id.* at 121-22.) As case agent, Stanton made the decision to press charges against Garrett and to present this evidence to the grand jury. (*Id.* at 122, 128-30, 132; Donnelly Dep., at 48.) At that time, Stanton identified Garrett as the suspect in the

---

[8]     The first time Stanton ever saw Garrett was at his deposition on February 18, 2009. (Stanton Dep., at 136, 144.) Had Stanton met Garrett before bringing felony charges against her, he would have learned that she is the victim of multiple strokes (the first of which occurred in 2001), that she has been disabled since July 2001, that she has been confined to a wheelchair since suffering her first stroke, and that she speaks with a significant impairment. (Richardson Aff., ¶¶ 2, 3, 5.) Given that the person who sold crack cocaine to Dunn and Donnelly in October 2003 was fully ambulatory and had no difficulty speaking, locating Garrett would have readily revealed to Stanton that she could not be the person he was looking for.

October 14 drug transaction; however, he does not recall whether he told the grand jury how he identified Garrett as the suspect.  (Stanton Dep., at 124-25.)  In the light most favorable to the nonmovant, the record supports an inference that Stanton did not reveal to the grand jury the tenuous process by which he came to identify Garrett as the suspect.

        *4.*      *The Prosecution of Garrett.*

Based solely on information supplied by Stanton, the grand jury indicted Garrett for the offenses of unlawful distribution of a controlled substance, attempt to commit controlled substance crime, and theft of property third, based on the events of October 14 and 17, 2003.  (Stanton Dep., at 133, 135; doc. 60, Exhs. 11-12.)  A three-count Indictment charging Garrett with these offenses was filed in Baldwin County Circuit Court on April 20, 2004.  (Doc. 60, Exh. 24.)  Garrett was not immediately arrested or taken into custody.  Rather, she turned herself in on September 24, 2004.  (Doc. 55, Exh. L; doc. 60, Exh. 15.)  It is undisputed that Garrett was bonded out immediately, and that she was never held at the Baldwin County Corrections Center, or anywhere else.  (*See* doc. 54, at 7-8; doc. 60, at 13.)[9]

Garrett's attorney brought Garrett to the Robertsdale Sheriff's Office to meet Dunn on February 13, 2006.  (Doc. 55, Exh. H.)[10]  Dunn immediately realized that Garrett was not the person who had sold crack cocaine to him.  (Dunn Dep., at 52-53.)  According to Dunn, "When I came in, I saw her face and I knew it wasn't her."  (*Id.* at 59.)  Dunn explained, "It was obvious when I first saw her" that Garrett was not the offender, and that Garrett did not look like the person in the drug transaction video.  (*Id.* at 70-71.)  So Dunn notified his supervisors at the Baldwin County Sheriff's Office that Garrett had been misidentified, after which the Sheriff's Office undertook to dismiss the charges against Garrett and restore her Social Security benefits

---

[9]      Plaintiff asserts (with no supporting evidence) that Garrett was required to wear a leg monitor as a condition of her bond.  (Doc. 60, at 13.)  The fragmentary exhibit plaintiff cites for this proposition is inscrutable.  Even assuming there were record evidence of this fact, plaintiff has advanced no argument that the imposition of a monitoring device as a condition of bond affects the legal analysis on summary judgment.  The Court will not *sua sponte* attempt to develop plaintiff's argument for her.

[10]    It is unclear what, if anything, happened concerning Garrett's criminal charges during the intervening 17 months or why it took so long for the mistaken identity issue to be brought to the authorities' attention.

(which had been suspended after her indictment).  (*Id.*)  In short order, the District Attorney's
Office administratively closed the case, and obtained dismissal of all charges against Garrett.
(*Id.* at 72; doc. 55, Exh. H; doc. 60, Exh. 31.)  On February 22, 2006, the Baldwin County
Sheriff's Office wrote a letter of apology for the "human error" that had resulted in the bringing
of charges against Garrett.  (Doc. 60, Exh. 25.)  This lawsuit followed.

## II.    Summary Judgment Standard.

Summary judgment should be granted only if "there is no genuine issue as to any
material fact and ... the movant is entitled to judgment as a matter of law."  Rule 56(c),
Fed.R.Civ.P.  The party seeking summary judgment bears "the initial burden to show the district
court, by reference to materials on file, that there are no genuine issues of material fact that
should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).
Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to
show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make
'a sufficient showing on an essential element of her case with respect to which she has the burden
of proof,' the moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v.
Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party
has met its burden, the court must stop short of weighing the evidence and making credibility
determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be
believed, and all justifiable inferences are to be drawn in his favor."  *Tipton v. Bergrohr GMBH-
Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).
"Summary judgment is justified only for those cases devoid of any need for factual
determinations."  *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987)
(citation omitted).

## III.   Analysis.

### A.    *Section 1983 Malicious Prosecution Claim.*

With regard to Garrett's § 1983 cause of action for malicious prosecution, it is clear that
such a claim constitutes a viable constitutional tort in the Eleventh Circuit.  *See, e.g., Kjellsen v.
Mills*, 517 F.3d 1232, 1237 (11th Cir. 2008) ("This Court has identified malicious prosecution as
a violation of the Fourth Amendment and a viable constitutional tort cognizable under § 1983. ...
[A] Fourth Amendment malicious prosecution claim under § 1983 remains a federal

-8-

constitutional claim ....") (citation omitted); *Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1144 (11th Cir. 2007) (similar); *Uboh v. Reno*, 141 F.3d 1000, 1002-03 (11th Cir. 1998) ("our court ... unequivocally has identified malicious prosecution to be a constitutional tort that is cognizable under § 1983").[11]

> 1.     *Plaintiff was Seized for Fourth Amendment Purposes.*

"To establish a federal malicious prosecution claim under § 1983, a plaintiff must prove (1) the elements of the common law tort of malicious prosecution, and (2) a violation of her Fourth Amendment right to be free from unreasonable seizures." *Kingsland v. City of Miami*, 382 F.3d 1220, 1234 (11th Cir. 2004).[12] A § 1983 malicious prosecution cause of action does not simply mimic its common-law counterpart;[13] to the contrary, Garrett must also show that she was

---

[11]     In light of this clear binding precedent, defendant's three-page discussion in its Reply Brief lamenting the "confusion" inherent in Garrett framing her claim as a § 1983 malicious prosecution claim muddies the waters unnecessarily. (*See* doc. 61, at 2-4.) The Court likewise cannot agree with defendant's characterization of plaintiff's brief as "cit[ing] cases from a wide variety of state and federal courts with respect to her § 1983 malicious prosecution claim, adding to the confusion." (Doc. 61, at 4.) Plaintiff's analysis properly centers on Eleventh Circuit authorities. Whatever variations in the law may exist elsewhere, the Court perceives no "confusion" in this Circuit as to the proper elements and contours of a § 1983 malicious prosecution cause of action. Those principles govern here.

[12]     *See also Shaarbay v. Palm Beach County Jail*, 2009 WL 3401423, *3 (11th Cir. Oct. 23, 2009) ("In order to prove malicious prosecution under § 1983, a plaintiff must establish (1) the elements of the common law tort of malicious prosecution, and (2) a violation of [his] Fourth Amendment right to be free from unreasonable seizures.") (citations and internal quotation marks omitted); *Chaney v. City of Orlando, FL*, 2008 WL 3906838, *4 (11th Cir. Aug. 26, 2008) ("Although malicious prosecution is a viable constitutional tort under 42 U.S.C. § 1983, a prevailing plaintiff must show both a violation of his Fourth Amendment right to be free from an unreasonable seizure and the elements of the common law tort of malicious prosecution.").

[13]     The Eleventh Circuit has stressed "that Section 1983 must not be used as a font of tort law to convert state tort claims into federal causes of action." *Peterson v. Baker*, 504 F.3d 1331, 1336 (11th Cir. 2007) (citation and internal quotation marks omitted); *see also Bradberry v. Pinellas County*, 789 F.2d 1513, 1517 (11th Cir. 1986) ("It is beyond peradventure that § 1983 did not make every tort committed under color of state law actionable in federal court."). "Section 1983 was not meant to supply an exclusive federal remedy for every alleged wrong committed by state officials." *Jefferson v. Jefferson County Public School System*, 360 F.3d 583, 585 n.5 (6th Cir. 2004) (citation omitted).

seized in violation of her Fourth Amendment rights.  *See id.* at 1234 (plaintiff in § 1983 malicious prosecution claim "bears the burden of proving that she was seized in relation to the prosecution, in violation of her constitutional rights"); *Nieves v. McSweeney*, 241 F.3d 46, 57 (1st Cir. 2001) ("[I]n the absence of an anchoring constitutional violation, the appellants' section 1983 malicious prosecution claim topples."); *Love v. Oliver*, 450 F. Supp.2d 1336, 1340 (N.D. Ga. 2006) ("to avoid summary judgment for Defendant on her [§ 1983 malicious prosecution] claim, Plaintiff bears the burden of proving that she was seized in relation to the prosecution, in violation of her constitutional rights") (citation and internal quotation marks omitted). Defendant's leading argument in support of his Rule 56 Motion on the § 1983 claim is that the Fourth Amendment seizure element poses insuperable difficulties of proof for Garrett.

Confronted with this argument, plaintiff wrongly asserts that the tort of malicious prosecution only "implicates post-arraignment deprivations of liberty" (doc. 60, at 24),[14] and fails to identify a specific deprivation pre- or post-arraignment.  Instead, she resorts to vagueness, generically invoking the entire sequence of events by stating that "Garrett's deprivation of liberty arises out of the false information Stanton provided to the Grand Jury, her subsequent arrest pursuant to a warrant being issued, her arraignment and prosecution."  (*Id.*) Peering through this smokescreen, the critical question remains unanswered: On what deprivation is plaintiff's § 1983 malicious prosecution claim predicated?  It is uncontroverted that, although a warrant issued for Garrett's arrest, she turned herself in and was bonded out immediately.  There is no evidence that Garrett was ever held in the Baldwin County Corrections Center.  Nothing in these facts fits neatly into traditional notions of a Fourth Amendment seizure.  *Cf. Eloy v. Guillot*, 2008 WL 2697211, *4 (11th Cir. July 11, 2008) ("This Court has

---

[14]     The decisional authority upon which plaintiff relies explains that (1) a § 1983 malicious prosecution claim requires a seizure to have been effected "pursuant to legal process"; (2) where "legal process" is in the form of a warrant "the arrest itself may constitute the seizure"; and (3) in the warrantless arrest context, "any post-arraignment deprivation of liberty" may constitute the seizure.  *Singer v. Fulton County Sheriff*, 63 F.3d 110, 117 (2nd Cir. 1995) (citations omitted).  Plaintiff apparently proceeds from the premise that this is a "warrantless arrest" case, which it obviously is not.  Because Garrett surrendered pursuant to a warrant, her claim is not limited to post-arraignment deprivations of liberty; rather, a qualifying seizure to support her § 1983 malicious prosecution claim could have occurred with an initial arrest, detention or surrender.

concluded that the Fourth Amendment can serve as the basis for a § 1983 malicious prosecution claim where the plaintiff, as part of the commencement of a criminal prosecution, ***is unlawfully and forcibly detained*** ....") (emphasis added); *Nieves*, 241 F.3d at 55 ("[A] seizure under Fourth Amendment jurisprudence is generally a discrete event, quintessentially an arrest ... or at least a physical detention.").[15]  Plaintiff's brief identifies no theory, no legal authority and no facts demonstrating that Garrett was ever seized within the meaning of the Fourth Amendment in connection with her prosecution.

Notwithstanding the infirmities in plaintiff's argument, the Fourth Amendment seizure element is satisfied here, as a matter of law.  It is undisputed that, when the grand jury handed down an indictment, a warrant was issued for Garrett's arrest, after which she turned herself in. There is considerable authority (albeit none identified by the parties) finding that self-surrender upon issuance of a warrant constitutes a Fourth Amendment seizure.  *See Albright v. Oliver*, 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (where arrest warrant was issued, after which plaintiff turned himself in and was released on bail, "his surrender to the State's show of authority constituted a seizure for purposes of the Fourth Amendment") (plurality opinion); *Whiting v. Traylor*, 85 F.3d 581, 585 n.6 (11th Cir. 1996) ("So, Whiting's initial surrender was a seizure; he subjected himself physically to the force of the state in response to an arrest warrant.").[16]  Clearly, then, Garrett was seized for Fourth Amendment purposes when she

---

[15]     "We adhere to the view that a person is seized only when, by means of physical force or a show of authority, his freedom of movement is restrained.  Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards."  *United States v. Mendenhall*, 446 U.S. 544, 553, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *see also Beshers v. Harrison*, 495 F.3d 1260, 1265 (11th Cir. 2007) ("A Fourth Amendment seizure occurs when there is a government termination of freedom of movement through means intentionally applied.") (citation and internal quotation marks omitted).

[16]     *See also Drudge v. City of Kissimmee*, 581 F. Supp.2d 1176, 1186 n.12 (M.D. Fla. 2008) ("[S]elf-surrender pursuant to an arrest warrant qualifies as a Fourth Amendment seizure."); *Caldwell v. Jones*, 513 F. Supp.2d 1000, 1009 (N.D. Ind. 2007) ("Numerous cases have held that voluntary surrender in response to an arrest warrant is the equivalent of a seizure under the Fourth Amendment."); *Pomykacz v. Borough of West Wildwood*, 438 F. Supp.2d 504, 512 (D.N.J. 2006) (seizure sufficient to support § 1983 malicious prosecution occurred when police "came to Pomykacz's house specifically to advise her that a warrant for her arrest had been issued and Pomykacz submitted to that authority when she appeared at the police station

surrendered to law enforcement authorities upon issuance of an arrest warrant.  The Court therefore rejects defendant's position that Stanton is entitled to summary judgment because there was no Fourth Amendment seizure pursuant to legal process.

That said, the Court agrees with defendant that the mere prosecution of Garrett, and the requirements that she comply with conditions of pretrial release and appear in court when summoned, do not amount to a continuing seizure for Fourth Amendment purposes.  *See Kingsland*, 382 F.3d at 1236 ("While we sympathize with Kingsland's anxiety and inconvenience, ... we cannot go so far as to say that the conditions of her pretrial release - which did not constitute a significant deprivation of liberty - constituted a seizure violative of the Fourth Amendment.").[17]  Accordingly, to the extent that plaintiff's § 1983 malicious prosecution cause of action survives, it must be confined to the facts and circumstances culminating in and including Garrett's surrender to law enforcement authorities in September 2004, and not any post-surrender events.  Once Garrett was released on bond, she was no longer seized for Fourth Amendment purposes, so she cannot maintain a § 1983 malicious prosecution claim based on those subsequent events because, as to those events, the seizure element would be missing.

---

shortly thereafter"); *Groom v. Fickes*, 966 F. Supp. 1466, 1474-75 (S.D. Tex. 1997) (where plaintiff reported to U.S. Marshal's Office after indictment, deprivation of liberty interest occurred because "[i]t is obvious that the plaintiff surrendered to the government's show of authority, *i.e.*, in response to the *criminal* indictment"); *Niemann v. Whalen*, 911 F. Supp. 656, 668 (S.D.N.Y. 1996) ("Clearly, when plaintiff surrendered herself ... at the state police barracks to be fingerprinted, photographed and taken before the Town Justice for arraignment, she was seized.").

[17]    *See also Bielanski v. County of Kane*, 550 F.3d 632, 642 (7th Cir. 2008) ("No court has held that a summons alone constitutes a seizure, and we conclude that a summons alone does not equal a seizure for Fourth Amendment purposes.  To hold otherwise would transform every traffic ticket and jury summons into a potential Section 1983 claim."); *Nieves*, 241 F.3d at 55 ("[I]f the concept of a seizure is regarded as elastic enough to encompass standard conditions of pretrial release, virtually every criminal defendant will be deemed to be seized pending the resolution of the charges against him.  That would mean, in turn, that nearly every malicious prosecution claim could be brought before a federal court under the aegis of section 1983.  We believe that this is much too ambitious a view of the law."); *Love*, 450 F. Supp.2d at 1336 (dismissing plaintiff's § 1983 malicious prosecution claim for lack of deprivation of liberty, where plaintiff was released on bond after initial appearance, such that she was no longer seized for Fourth Amendment purposes).

2.      *The Chain of Causation.*

As noted *supra*, Garrett's § 1983 false imprisonment claim requires her not only to show a Fourth Amendment violation, but also to establish "the elements of the common law tort of malicious prosecution." *Kingsland*, 382 F.3d at 1234.  Those elements include "(1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff accused." *Wood v. Kesler*, 323 F.3d 872, 882 (11th Cir. 2003); *see also Hunter v. Mooring Tax Asset Group, LLC*, --- So.3d ----, 2009 WL 2573913, *3 (Ala. Aug. 21, 2009) (reciting similar elements for Alabama malicious prosecution claim).[18]  Defendant argues on summary judgment that plaintiff has not adduced sufficient evidence to present a jury question as to the causation and lack of probable cause elements.

Stanton's causation argument is that "[t]he chain of causation necessary to hold Defendant Stanton liable was broken by the independent actions of a prosecutor and a grand jury," and that "the intervening independent acts of the prosecutor and grand jury render the federal malicious prosecution claim void."  (Doc. 61, at 8-9.)  In other words, defendant maintains that the wrongful prosecution of Garrett was not Stanton's fault because it took a grand jury's indictment and a district attorney's decision to prosecute for those charges to be brought and pursued against her.  There is facial support for this proposition in Eleventh Circuit jurisprudence.  In *Barts v. Joyner*, 865 F.2d 1187 (11th Cir. 1989), a plaintiff who had been tried, convicted, retried, and ultimately acquitted on murder charges filed a § 1983 action against two sheriff's deputies contending that they had violated her Fourth Amendment rights by initially detaining her and bringing her to the sheriff's station.  Despite the defendants' minuscule role in

_____

[18]      In summary judgment briefing, defendant takes plaintiff to task for commingling Alabama state-court malicious prosecution precedents with his federal malicious prosecution claim.  Plaintiff was correct to proceed in this manner; indeed, the Eleventh Circuit has consistently looked to state and federal law for purposes of determining whether common law elements of malicious prosecution have been satisfied in the context of a § 1983 malicious prosecution cause of action.  *See, e.g., Kingsland*, 382 F.3d at 1234 (examining Florida law to explore elements of common law tort of malicious prosecution in federal malicious prosecution analysis); *Wood*, 323 F.3d at 882 (explaining in context of § 1983 malicious prosecution action that "both state law and federal law help inform the elements of the common law tort of malicious prosecution").

her protracted ordeal in the criminal justice system, the *Barts* plaintiff sought to hold them liable for all damages resulting from her criminal trials, conviction, incarceration and so on.  The Eleventh Circuit rejected this overreaching theory of recovery, explaining that "[t]he intervening acts of the prosecutor, grand jury, judge and jury – assuming that these court officials acted without malice that caused them to abuse their powers – each break the chain of causation ***unless plaintiff can show that these intervening acts were the result of deception or undue pressure by the defendant policemen***."  *Barts*, 865 F.2d at 1195 (emphasis added).[19]

But the summary judgment record, viewed in the light most favorable to Garrett, supports a reasonable inference that the "deception or undue pressure" exception is in fact present here.  Stanton's testimony is that it was his decision, and his decision alone, to present Garrett's case to the grand jury.[20]  Moreover, there is no evidence that Stanton (apparently the only witness to appear before the grand jury) informed the grand jury about the porous methodology he utilized in identifying Garrett.  To the contrary, Stanton testified that he does not recall whether he told the grand jury how he came to identify Garrett as the suspect.  This evidence in turn supports a reasonable inference for summary judgment purposes that Stanton withheld that information from the grand jury, such that it was unknown to them how tenuous Stanton's identification of Garrett was, how contorted the reasoning was that produced such an identification, and how both of the other officers had expressed skepticism that Garrett was the offender.  In short, the record supports a reasonable inference that Garrett suppressed the very information (which was in his

---

[19]    The *Barts* panel reasoned that a police officer's role in the overall prosecution is generally limited, and that it would be unfair and inappropriate to extend liability for damages to aspects of the criminal justice process over which the officer exercised no control.  "Once someone is arrested and then substantial evidence of the suspect's guilt comes to light, the police can do little or nothing to stop further proceedings.  Holding the police responsible for damage due to these later proceedings makes little sense.  Prosecuting, indicting, finding ultimate guilt, and sentencing criminal defendants are not the business of the police."  *Barts*, 865 F.2d at 1196.

[20]    Despite his vague attempts to pass responsibility to the District Attorney's Office, Stanton points to no evidence that he sought or obtained approval from any prosecutorial authority before presenting Garrett's case to the grand jury.  Rather, the evidence viewed in the light most favorable to plaintiff is that Stanton acted alone in seeking charges against Garrett from the grand jury, for the stated purposes of obtaining a warrant for her arrest and seeing if there was cause to continue the investigation.

-14-

sole possession) that the grand jury needed to know in order to evaluate the existence of probable cause, and instead glossed over the decidedly shaky basis of his identification of Garrett as the perpetrator of the underlying offenses.  The Court agrees with plaintiff that these circumstances, if found by the jury, would support a factual finding that there was no intervening causation and that Stanton himself was solely responsible for the indictment that brought about the Fourth Amendment seizure of Garrett.[21]

As defendant recognizes, however, the fundamental problem with plaintiff's efforts to hold Stanton liable for statements or omissions in his grand jury testimony is that the doctrine of absolute immunity precludes imposition of liability on that basis.  The law of this Circuit is that "[w]itnesses are granted absolute immunity for their testimony ... during grand jury proceedings. ... Police officers enjoy the same absolute immunity as lay witnesses for their testimony ... in front of the grand jury." *Jones v. Cannon*, 174 F.3d 1271, 1281 (11th Cir. 1999).[22]  The policy rationale for extending absolute immunity to those circumstances is that "[p]rotecting witnesses from liability encourages witnesses to testify and furthers the fact-finding and truth-seeking process of the courts." *Russo v. Glasser*, 279 F. Supp.2d 136, 144 n.13 (D. Conn. 2003). Besides, there is no need to create a civil remedy to deter false testimony in judicial or grand jury

---

[21]    This determination is bolstered by *Barts*, wherein the court explained as follows: "The police have it within their power to avoid the damage caused by a false arrest simply by not seeking the warrant.  Thus, because the police have control over the damages, it makes sense to hold the police responsible for damages caused directly by the initial arrest when the police acted clearly unlawfully ... in seeking a warrant to arrest someone.  Such liability punishes and deters conduct over which the police have control." *Barts*, 865 F.2d at 1196.  That is precisely the situation here, in that it was solely within Stanton's control to decide whether to seek a warrant on Garrett from the grand jury.

[22]    *See also Holmes v. Crosby*, 418 F.3d 1256, 1258 (11th Cir. 2005) (reaffirming notion "that witnesses in criminal trials and grand jury proceedings are afforded absolute immunity," and extending that principle to protect parole officers testifying at revocation hearings when they act within the scope of their duties); *Scarbrough v. Myles*, 245 F.3d 1299, 1305 (11th Cir. 2001) ("Police officers have the same absolute immunity as lay witnesses in testifying at trial or before a grand jury. ... As with any witness testifying under oath, the penalty for false testimony is potential prosecution for perjury."); *Enlow v. Tishomingo County, Miss.*, 962 F.2d 501, 511 (5th Cir. 1992) ("Witnesses, including police officers, are also shielded by absolute immunity from liability for their allegedly perjurious testimony.").

proceedings because "[t]he penalty for false testimony under such circumstances is ... a potential prosecution for perjury." *Cannon*, 174 F.3d at 1281.

This immunity is fatal to Garrett's § 1983 malicious prosecution theory. Recall that the essence of such a cause of action is that the defendant instituted or continued an unfounded criminal prosecution against the plaintiff, with malice and without probable cause, injuring the plaintiff and violating her Fourth Amendment right to be free from unreasonable seizure. What did Stanton do to institute or continue the prosecution of Garrett? According to plaintiff, Stanton went before the grand jury and convinced them to issue warrants and an indictment for Garrett, all based on half-truths and reckless surmise (inasmuch as he concealed the defects that resulted in his unreliable identification of Garrett as the suspect). But that theory inexorably collides with the absolute immunity doctrine, because plaintiff would predicate liability squarely on statements and omissions from Stanton's grand jury testimony. As to that testimony, Stanton is absolutely immune from § 1983 liability in the Eleventh Circuit.[23] Plaintiff has failed to identify

---

[23]     Although plaintiff does not invoke it, a number of courts have recognized a "complaining witness" exception to absolute immunity principles in a variety of circumstances. *See, e.g., Van de Kamp v. Goldstein*, --- U.S. ----, 129 S.Ct. 855, 861, 172 L.Ed.2d 706 (2009) ("We have held that absolute immunity does not apply when ... a prosecutor acts as a complaining witness in support of a warrant application"); *Malley v. Briggs*, 475 U.S. 335, 340-45, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (rejecting absolute immunity for complaining witnesses, and instead finding that "qualified immunity [is] accorded an officer whose request for a warrant allegedly caused an unconstitutional arrest"); *Vakilian v. Shaw*, 335 F.3d 509, 516 (6th Cir. 2003) (officer who "testified at an *ex parte* proceeding where his actions were that of a complaining witness rather than a testifying witness ... is not protected by absolute immunity"); *Keko v. Hingle*, 318 F.3d 639, 643 (5th Cir. 2003) ("when either a police officer or a prosecutor becomes a complaining witness in a probable cause hearing, neither official may claim absolute immunity"); *Gray v. Poole*, 275 F.3d 1113, 1118 (D.C. Cir. 2002) ("officials who serve as complaining witnesses receive qualified, not absolute, immunity"); *Enlow*, 962 F.2d at 511 n.29 ("In a malicious prosecution action, ... a plaintiff seeks to hold the complaining witness liable for the witness's role in the initiation of a baseless prosecution; at common law, complaining witnesses were not absolutely immune."). Under the facts presented here, Stanton could reasonably be viewed as the "complaining witness" because he singlehandedly initiated the prosecution of Garrett. *See, e.g., Curtis v. Bembenek*, 48 F.3d 281, 286 (7th Cir. 1995) (defining "complaining witness" as "the person who actively instigated or encouraged the prosecution of the plaintiff") (citation omitted). But the Eleventh Circuit has rejected the premise that complaining witness status constitutes an exception to a witness's absolute immunity for even false grand jury testimony. *See Cannon*, 174 F.3d at 1287 n.10 ("For several reasons, we

any facts or circumstances outside of Stanton's grand jury testimony through which he instituted or continued the prosecution of Garrett. Thus, there are no other record facts that might support imposition of § 1983 malicious prosecution liability against him, nor is there any other basis for concluding that the grand jury's indictment of Garrett did not break the chain of causation.[24] Accordingly, Stanton is entitled to summary judgment on that cause of action pursuant to the absolute immunity granted to grand jury witnesses.

**B.**     ***Plaintiff's State-Law Claims are Barred by Sovereign Immunity.***

With respect to Garrett's state-law causes of action for malicious prosecution, outrage, wantonness and civil conspiracy, Stanton seeks summary judgment on grounds of sovereign immunity.

Pursuant to Article I, Section 14 of the Alabama Constitution of 1901, "the State of Alabama shall never be made a defendant in any court of law or equity." *Id.*  The Alabama

expressly reject carving out an exception to absolute immunity for grand jury testimony, even if false and even if [defendant] were construed to be a complaining witness."). To be sure, this rule creates the somewhat anomalous result that a law enforcement officer who seeks to obtain a warrant by falsely testifying before a grand jury is entitled to absolute immunity, while one who does so via false affidavit submitted to a judge is not. Nonetheless, this Court is bound to adhere to that rule, and will do so. *But cf. White v. Frank*, 855 F.2d 956, 961 (2nd Cir. 1988) ("Where ... the constitutional tort is the action of a police officer in initiating a baseless prosecution, his role as a complaining witness renders him liable to the victim under section 1983 ... and the fact that his testimony at a judicial proceeding may have been the means by which he initiated the prosecution does not permit him to transpose the immunity available for defamation as a defense to malicious prosecution.").

[24]     On the chain of causation point, plaintiff seeks to avoid the intervening-causation line of authorities by arguing that Stanton misled the grand jury. Even if that were true, those misleading statements cannot form the basis of § 1983 malicious prosecution liability for Stanton because of the absolute immunity principles identified above; therefore, plaintiff cannot rely on Stanton's purportedly reckless or incomplete statements to the grand jury to overcome defendant's "chain of causation" argument. Simply put, plaintiff has identified no evidence or argument satisfying <u>both</u> of the following criteria: (1) that the intervening acts of the grand jury were the result of deception or undue pressure by Stanton; and (2) that Stanton's conduct in deceiving or pressuring the grand jury was beyond the scope of the absolute immunity afforded to all grand jury testimony. Accordingly, the grand jury's decision to indict Garrett is indeed an intervening cause that breaks the chain of causation and defeats Garrett's § 1983 malicious prosecution claim against Stanton.

Supreme Court has recognized that "[t]he wall of immunity erected by § 14 is nearly impregnable." *Ex parte Davis*, 930 So.2d 497, 500 (Ala. 2005) (citation omitted).  In accordance with Section 14's sovereign immunity provision, courts applying Alabama law have routinely held that sheriffs are executive officers of the State who, with few exceptions, are absolutely immune from suit on state-law claims.  *See, e.g., Ex parte Haralson*, 853 So.2d 928, 932 (Ala. 2003) ("As an executive officer, a sheriff is immune from being sued in the execution of the duties of his office under Art. I, § 14, Alabama Const. 1901."); *Boshell v. Walker County Sheriff*, 598 So.2d 843, 844 (Ala. 1992) (similar).

This immunity has been routinely extended to deputy sheriffs.  *See Vinson v. Clarke County, Ala.*, 10 F. Supp.2d 1282, 1295 n.10 (S.D. Ala. 1998) ("Alabama courts have repeatedly held that a deputy is a state officer who is entitled to the same immunities enjoyed by a sheriff."). In so doing, Alabama courts reason that "deputy sheriffs are immune to the same extent sheriffs are immune because the deputy sheriff is the alter ego of the sheriff."  *Haralson*, 853 So.2d at 932 (citations and internal quotation marks omitted).  "In general, the acts of the deputy sheriff are the acts of the sheriff. ... Thus, it is logical that those acts should enjoy the same immunity covering the sheriff's own acts."  *Davis*, 930 So.2d at 501 (citations and internal quotation marks omitted).  The bottom line, then, is that state-law claims against a deputy sheriff in his individual capacity for monetary damages are barred by Section 14 immunity when the deputy is "acting within the line and scope of [his] employment."  *Ex parte Sumter County*, 953 So.2d 1235, 1239 (Ala. 2006).

The only complicating factor in application of this sovereign immunity to Stanton lies in the fact that he was both a City of Daphne police officer and a *bona fide* deputy sheriff of the Baldwin County Sheriff's Office.  He carried badges for each and performed duties for each. Based on this dual role, plaintiff argues that sovereign immunity is inapplicable to Stanton because defendant "has not provided the Court with any legal authority extending sovereign immunity to municipal police officers temporarily assigned to a task force."  (Doc. 60, at 27.) Plaintiff is correct that defendant has not cited, and the Court's own research has not revealed, any Alabama authorities factually on all fours with this case.  But conceptually, Section 14 immunity would so logically apply to Stanton's circumstances that it is extraordinarily difficult

-18-

to envision Alabama courts holding otherwise.[25]

It is undisputed that Stanton was a City of Daphne police officer who had been assigned for the preceding five years as the lone Daphne representative on the Baldwin County Sheriff's Office Drug Task Force, pursuant to which his sole duty was to investigate narcotics distribution offenses throughout Baldwin County.  It is further undisputed that Stanton was formally sworn in as a deputy sheriff by the Baldwin County Sheriff's Office, carried a deputy badge when performing task force business, and worked out of a sheriff's office facility in Robertsdale. More importantly, it is undisputed that Stanton was performing Baldwin County Sheriff's Office Drug Task Force duties with other task force agents (who were not in any way affiliated with the City of Daphne Police Department)[26] as to the undercover drug buys at Jackson Circle in October 2003.  All of Stanton's subsequent efforts to identify and prosecute the offender from those transactions (including the specific acts and omissions that give rise to Garrett's state-law claims against him) were necessarily performed in furtherance of his Baldwin County Sheriff's Office Drug Task Force responsibilities.

The record unambiguously shows that Stanton was working in his capacity as a Baldwin County Deputy Sheriff when he engaged in the conduct for which Garrett has sued him.  He was acting as part of the Baldwin County Sheriff's Office Drug Task Force, which was itself an extension of the Baldwin County Sheriff.  Under clearly established principles of Alabama law, the immunities protecting the Baldwin County Sheriff likewise extend to deputy sheriffs (such as those serving on a Drug Task Force) working for him and on his behalf.  Stated differently, when Stanton was performing Drug Task Force business as a deputy sheriff, he was the Baldwin County Sheriff's alter ego; therefore, Stanton should enjoy Section 14 immunity to the same

---

[25]     Both sides' memoranda would have been strengthened considerably had they explored the policy justifications underlying Section 14 immunity, and applied that analysis to the facts and circumstances presented here, rather than simply offering conclusory assertions that such immunity should or should not extend to Stanton, without explaining why his dual-role status should or should not matter.

[26]     Defendant Dunn was a full-time deputy at the Baldwin County Sheriff's Office as of October 2003, and defendant Donnelly was a City of Orange Beach Police Department officer who, like Stanton, had been deputized to serve in the Baldwin County Sheriff's Office Task Force.  (Dunn Dep., at 14; Donnelly Dep., at 11-13, 18.)

extent that the sheriff would.  Plaintiff has identified no reason, and there is no reason to think, that Stanton was any less the sheriff's alter ego because he was a non-permanent deputy working on the BCSO Drug Task Force than he would be if he were a full-time deputy assigned to that very same Task Force (as Dunn was).  Thus, the Court finds no principled basis for the distinction urged by plaintiff, and no reason to conclude that Stanton's "dual role" poses any impediment to his eligibility for Section 14 immunity when performing Baldwin County Sheriff's Office duties as a deputy sheriff.

        In sum, the uncontroverted summary judgment evidence shows that Stanton was working in the line and scope of his duties as a deputy sheriff assigned to the Baldwin County Sheriff's Office Drug Task Force at all times relevant to these proceedings.[27]  As such, Stanton was acting as the sheriff's alter ego, and is cloaked with absolute immunity from liability in his individual capacity pursuant to Article I, Section 14 of the Alabama Constitution of 1901 for the state-law claims brought by Garrett.[28]  Stanton's Motion for Summary Judgment is therefore **granted** as to

---

[27]     Stanton's deposition testimony concerning his job duties during the relevant time period reinforces this point:

"Q:     What duties did you have as an officer in October of 2003?
"A:     At that time, like I say, I was with the Baldwin County Sheriff's Department with the drug task force.  My duties were to investigate drug activity within Daphne and also throughout the whole county of Baldwin County."

(Stanton Dep., at 15.)

[28]     Plaintiff's skeletal arguments to the contrary are not compelling.  First, plaintiff points out that "[t]he evidence supports the clear inference that Stanton was a Daphne police officer at all times but with an expanded jurisdiction."  (Doc. 60, at 27.)  This confuses the issue.  The proper question for Section 14 immunity purposes is not whether Stanton was a municipal police officer, but rather whether Stanton was acting as a sheriff's deputy.  If he was, then he is entitled to sovereign immunity.  If he wasn't, then he is not.  Plaintiff offers no evidence and formulates no argument that Stanton was not in fact acting in his role as BCSO deputy sheriff during the events in question.  Second, plaintiff states, "Stanton did not consider himself to be a deputy sheriff; and neither did his employer, the City of Daphne."  (Doc. 60, at 27.)  Plaintiff points to no evidence that might support such an inference.  In fact, Stanton's deposition testimony was unequivocal that "I was sworn in as a deputy sheriff" and "I was with the Baldwin County Sheriff's Department with the drug task force" in October 2003.  (Stanton Dep., at 14-15.)  Such testimony directly contradicts plaintiff's statement that Stanton did not consider

all state-law causes of action.

## IV.   Conclusion.

The facts of this case are troubling.  Stanton identified Garrett (a wheelchair-bound stroke victim who is barely able to speak) as the fully ambulatory, clear-voiced woman who had sold crack cocaine to two other officers in October 2003.  Stanton made this identification without ever laying eyes on the drug dealer or Garrett.  He simply compared the video image of the drug dealer to the driver's license photograph of Garrett, which he found upon hearing a partial name of "Jeanette" from an unknown source.  When he showed Garrett's photograph to the two officers who actually participated in the drug transaction and saw the offender, both expressed skepticism that Garrett was she.  Furthermore, Stanton shrugged off the 46-lb. differential between the offender's estimated weight and that listed for Garrett.  Stanton did not attempt to locate or interview Garrett.  He did not engage in any other investigation.  Instead, based on this flimsy identification, Stanton decided to go before the grand jury and tell them that Garrett was suspected of selling crack cocaine to undercover officers.  An indictment and arrest warrant followed, and Garrett was subjected to the traumatic ordeal of being charged with narcotics offenses, being booked and released on bond, and being required to appear for court hearings, until such time as Stanton's error was recognized, the charges were dismissed, and the sheriff's office apologized.

Reasonable investigation would have established that Garrett was not and could not be the offender, yet no such investigation was performed.  Garrett no doubt suffered anxiety, distress and embarrassment as a result.  But not every wrong has a remedy.  As set forth above, the law unequivocally establishes that Stanton was entitled to absolute immunity from § 1983 malicious prosecution liability for his testimony to the grand jury that precipitated the indictment and warrant.  And because he was acting within the line and scope of his duties as a Baldwin County Deputy Sheriff, Stanton is protected by sovereign immunity for all state-law claims against him.  For these reasons, Stanton's Motion for Summary Judgment (doc. 53) must be

---

himself to be a deputy sheriff.  And there is zero evidence to support plaintiff's conclusory statement that the City of Daphne Police Department did not consider Stanton to be a deputy sheriff, even assuming that the City's perception is somehow relevant to the analysis.

**granted**, and all claims against him are **dismissed with prejudice**.

The Motions for Summary Judgment (docs. 49, 51) filed by defendants Dunn and Donnelly, are **granted** with plaintiff's consent, and all claims against those two defendants are likewise **dismissed with prejudice**.

There being no remaining claims in this action, a final judgment will enter.

DONE and ORDERED this 19th day of November, 2009.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE